STATE of Minnesota, Respondent,

v.

William Dwight McRAE, Petitioner,
Appellant.

No. C1–91–1461.

Supreme Court of Minnesota.

Dec. 24, 1992.

John M. Stuart, Public Defender, Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Lee W. Barry, III, Sr. Asst. County Atty., Minneapolis, for respondent.

COYNE, Justice.

In an unpublished decision, the court of appeals affirmed defendant's conviction of criminal sexual conduct in the second degree against a number of claims, including one dealing with the prosecutor's exercise of a peremptory challenge to exclude a black person as a juror, one concerning the trial court's closure of trial when the victim, a teenager, testified, and one relating to the prosecutor's misconduct in using a statement to cross-examine defendant which the trial court had ordered suppressed. Because of our concern about the court of appeals' analysis of each of these important issues, we granted defendant's petition for review. For reasons that follow, we reverse defendant's conviction and remand to the district court for a new trial.

Around 8:45 p.m. on February 4, 1990, T.W., a 15–year–old girl, was sexually assaulted after she got off a bus near Chicago and Franklin in Minneapolis and was trying to find her way to the apartment of a friend. Her assailant grabbed her buttocks, followed her when she attempted to walk away, pulled her pants down partially, then threw her to the ground. She scrambled to her feet and ran to a nearby apartment building, ringing all the buzzers in the lobby until a tenant let her in to call the police. T.W. described her assailant as a tall (at least 6 feet tall) black man of medi- um build wearing a snowmobile suit and a purple knit cap and carrying a brown paper bag. A police officer on routine patrol had seen a man fitting this description in the vicinity of 19th and Chicago. He returned to the area and found the man a few blocks away, arguing with a man and a woman. Police brought T.W. to the scene and, from the squad car, which was stopped about 10 feet from the people, she immediately and positively identified defendant as her assailant.

Defendant testified at trial, denying the charge.

Defendant, who, as we said, is black,[1] argues first that the prosecutor improperly used a peremptory challenge to remove the only African American person from the panel of approximately 25 people from whom the jurors were selected.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court outlined a three-step process for trial court evaluation of a claim that the prosecutor used a peremptory challenge with racially discriminatory intent. The Court in the later case of *Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), summarized the process as follows:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [Citation omitted]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. [Citation omitted]. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. [Citation omitted].

Because of a concession by the state, we are not concerned in this case with the requirement that the defendant first make a prima facie showing of discriminatory

---

1. For whatever relevance it may have, and the state believes it has considerable relevance, the victim in this case is, like defendant, a black person.

exercise of a peremptory challenge.[2] We are concerned, however, with the second and third steps in the three-step process.

*Hernandez* makes it clear that the explanation provided by the prosecutor does not have to be "valid" in the sense of establishing a reasonable cause for challenge, 111 S.Ct. at 1868, but the explanation must be race-neutral. As the Court put it:

> At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

111 S.Ct. at 1866.

Once the prosecutor has given a facially valid race-neutral explanation, then the trial court, considering all the relevant facts bearing on the issue, must make what the Court in *Hernandez* characterized as an essentially factual determination of whether the defendant has proven that the prosecutor acted with discriminatory intent or purpose. —— U.S. at ——, 111 S.Ct. at 1868–69. If the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race, the trial court may consider that as one of the relevant circumstances bearing on the determination whether the facially-valid reason given by the prosecutor is a pretextual explanation offered to mask a discriminatory intent. *Id.* As always, of course, considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility. *Id.* —— U.S. at ——, 111 S.Ct. at 1869–71. Moreover, the United States Supreme Court has indicated that it will give state court review of such a finding a presumption of correctness and will reverse the state court only if the finding is clearly erroneous. *Id.* —— U.S. at ——, 111 S.Ct. at 1870–71.

■ The juror in question is an African-American woman working as a registered nurse at the V.A. Medical Center and living in Bloomington. The prosecutor began his examination of her by asking her a question he had not asked the white jurors he had questioned—whether she thought that "the system is generally pretty fair." The juror replied, "Generally." The prosecutor then pressed her on this, as follows:

Q. Generally it is fair.

A. Generally it's fair.

Q. Okay. It sounds like—I need to follow up a little bit. What—what's not fair about it, or sounds like you have some feelings about it?

A. Um, I guess my knowledge and my background isn't enough to make that decision, or to make a decision as far as whether it is fair and whether it's not fair. Standing back and looking at the process, and things that have happened, nothing specific, I would say I have questions about it, questions about the system.

Q. Okay. And that's okay. You don't have—it's just your attitude or your feelings or your beliefs that are important.

A. Uh-huh.

Q. There is no right or wrong, just how you feel about it. What kinds of things trouble you or concern you about the system, about the way things do or don't work?

A. I would say prejudices. Biases, selection of things, nothing else.

Q. Okay. When you say prejudices and biases, what are you talking about specifically?

A. Just being aware of different ethnic backgrounds, you know, or—and the number of selections or the number of peer groups that's very obvious.

Q. Okay. Again, now, I—the reason I'm asking questions, like kind of open ended, instead of me just kind of trying to guess what you meant is just have you explain it as best you can. Okay. What's you're saying,

**2.** Cases of this court addressing this issue include *State v. Scott*, 493 N.W.2d 546 (Minn. 1992), *State v. Everett*, 472 N.W.2d 864, 868 (Minn.1991), and *State v. Moore*, 438 N.W.2d 101, 107 (Minn.1989).

and again, I want to make sure it's exactly what you're saying not what I'm saying, talking about disproportionate numbers of certain races are put through the system.

A. That's what I'm saying. That's what I'm saying, not, not, you know, not that I feel one way or the other, with you I'm just saying, it's an obvious thing, it's an obvious thing.

Q. Okay. So you see it as that's a problem. I mean, disproportionate numbers of let's say black people or black men, for example, are arrested and convicted. Disproportionate to the persons of the population, is that—.

A. One more time, say that one more time, I'm sorry.

Q. The defendant is black.

A. Uh-huh.

Q. Okay. And he's on trial, and it sounds like race is an issue you're concerned about, like black men, for example, I don't know, but black men maybe are arrested more often based on their percentages than white men, or they're convicted maybe more often than white men. Is that what you're saying?

A. I'm saying sure, that probably is the case, yes, that's probably the case. But I don't know, you know, whether that has a bearing.

Q. I don't either, I'm just asking you because when Mr. Paule asked you the question about the system, and it being, you know, fair or not fair or whatever.

A. Uh-huh.

Q. It's important to know, for example, if a juror—I'm prosecutor, right, and in my job if I can do it, is to present enough evidence to convict the defendant, to convince you beyond a reasonable doubt that he's guilty. If I can't do it, essentially he'd be found not guilty, wouldn't he?

A. Uh-huh.

Q. If I can do it, do you think he should certainly be found guilty?

A. Most definitely.

Q. Did you also understand that there may be certain jurors who have certain feelings or attitudes about whatever, that they couldn't do that, they couldn't for example, find somebody guilty because they just don't think the system is fair, or they couldn't find him not guilty, they think everybody who is charged is guilty. People have certain attitudes about all kinds of things, our job is to do the best we can to try to find out what some of those attitudes are to make sure we can get a collection of people who can convict him if he's guilty and acquit him if he's not guilty?

A. I understand that.

Q. Okay. Knowing what you know about, you know, your belief that the system maybe isn't perfect, should I be concerned? Is it something where you don't think you could convict him if he's proven—

A. No, no, no.

Q. Okay.

A. I would base my judgment on the evidence.

Q. Okay. Do you think the system here, in Minnesota, or Hennepin County for example works better than other places in the country, maybe?

A. I don't know. I don't have previous experience.

Q. Do you have a sense that when you talk about there being some inequality in the system, is your sense that right here it's the same way, just a sense, or not really enough information here in Hennepin County?

A. Uh-huh.

Q. Uh-huh?

A. No.

Q. No, you don't?

A. I think that there could be flaws in the system, too, if that's what you're asking me specifically. I don't—I don't know what the flaws are and I

don't know how to do anything about the flaws either.

Q. Okay. Okay. You also mentioned the selection of jurors as something that concerns you.

A. Uh-huh.

Q. What did you mean, what part of the selection process concerns you?

A. I mean not as a group, per se,—just as a representation of peers, I don't know how to explain it, I don't.

Q. Okay. Is it more how this group got called to where you are right now, that kind of thing, you mean?

A. No, I'm assuming, it was names chosen out of a box, so not that way, no. I'm saying I don't have a problem with you know, how claims (sic) are chosen for this situation.

Q. But it's just that you're talking about just in general that we're suppose to be a person who is charged of a crime should be tried before their peers.

A. Uh-huh, supposedly.

Q. Do you think that—is there a concern in your mind, assuming you are picked—

A. Uh-huh.

Q. On the jury, is there a concern of yours that that's not—that's not a jury of his peers, of Mr. McRae's peers?

A. No, probably not, no, we possibly aren't a jury of his peers.

Q. Okay. Are you able to get by that?

A. Yes.

Q. I'm asking all these questions, I'm not trying to put you on the spot.

A. I understand.

Q. But I need to know that you're going to be able to go either way.

A. Yes.

Q. Okay. And you feel pretty comfortable and pretty strongly that you could do that?

A. Yes.

Q. Even though you might believe the system would be better or could somehow be a little different.

A. Uh-huh.

When the prosecutor struck the juror in question and defense counsel asked the trial court for a *Batson* review of the striking, the prosecutor immediately replied by explaining the striking as follows:

[Batson] basically said that even in a case where the defendant is white, you can't strike a black person or a minority without a reason. The case stands, I think, for the proposition that there has to be articulable reason, you can't strike them particularly because they're black. The reason I struck [the juror in question] and we have a record to report that was because there was a transcript of the proceeding, she thinks the system is unfair, it's disproportionately prosecuted, arrested, throughout the system.

It was pretty clear to me that she had an attitude that where she thought that basically, the system is unfair to minorities, and the defendant's being black is— and her being black she would over compensate by basically letting this guy off. She went further and said she thinks the whole jury process is fraud, when I asked her articulate that, she said this is not a trial by his peers, meaning I guess there should be more black people overall. I got the sense of what her attitude was she wouldn't be fair to the State, would over compensate to the defendant. Plus, when I asked her for some detail about some of her answers, I don't known, if you were to look at her, you could tell, this is only my feeling from the way she was answering the questions, there was stuff were weren't getting, like there was more behind her answers than what she was articulating, but I think that there was way more than enough evidence from what she did articulate that leads me to think that she couldn't be fair to the State.

After a discussion off the record, the trial court then said:

I'm going to rule based upon what I heard that I think there was an articulable basis for the prosecutor's challenge in this case. She expressed concerns in three or four areas, not one. And at this

point I note for the record, there is a transcript available of this jury selection process, so that if the issue does come up on appeal, the transcript is available.

The crux of the prosecutor's explanation for his challenge was that the juror would not be impartial because of her feelings about "the system." Although the prosecutor's explanation includes a reason for striking this juror which seems racially-neutral on its face, the exaggeration employed by the prosecutor in making his explanation is very troubling. The prosecutor argued that the juror thought the "system is unfair" and that "she thinks the whole jury process is a fraud." While the juror did state a belief that there are "flaws" in the system, her response to the prosecutor's first question was that she thought "the system" is "generally fair." Her opinion that there were flaws in the system was expressed after repeated invitations from the prosecutor to find some fault with "the system." At no point did she state or agree that "the system is unfair" or that the "jury process is a fraud." In summary, on the record we have, the juror in question appears to have simply answered the prosecutor's questions—which the prosecutor had not asked of other potential jurors at that point—in the same way that a large percentage of fair-minded, reasonable black people and fair-minded, reasonable people of any other race would have answered the questions. To allow the striking of this juror on the basis of those answers in effect would allow a prosecutor to strike any fair-minded, reasonable black person from the jury panel who expressed any doubt the "the system" is perfect.

Moreover, one of the reasons the prosecutor gave for striking the African American juror was that he believed she might refuse to find defendant guilty simply because defendant was also a black person. As the prosecutor put it, "[S]he thought that basically, the system is unfair to minorities, and the defendant's being black is—and her being black she would over compensate by basically letting this guy off." Batson expressly forbids this type of reasoning to enter into the jury selection process. "[T]he prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986).

While the demeanor of the juror, the tone used in responding, and other similar factors certainly are factors that a trial court may consider in reviewing the prosecutor's exercise of a peremptory challenge, the record on appeal provides no real support for any argument that these factors played a part in the prosecutor's decision to strike. Moreover, it does not even appear of record that the trial court in fact understood that its role was more than simply to determine if the prosecutor articulated some basis for the challenge. *Hernandez* requires the trial court first to determine whether the prosecutor has articulated a facially race-neutral explanation for striking the juror in question and then to test the validity of the explanation—that is, to determine whether the proffered race-neutral reason was the actual basis for the peremptory strike or whether it was offered to mask a discriminatory intent or purpose. In short, the trial court has the duty to decide if there has been purposeful discrimination. *Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991); *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986).

We are not prepared to say on this record that the prosecutor actually had a discriminatory intent or purpose. We believe, however, that the explanation articulated by the prosecutor on the record is not the sort of racially-neutral explanation that the Court contemplated in *Batson* and subsequent cases. Indeed, the record of the prosecutor's examination of the juror in question fails to support the explanation given by the prosecutor for striking the juror and suggests instead that the prosecutor's questioning was prompted by the juror's race and that the juror is a fair-

minded reasonable person who was ready and willing to serve fairly, impartially and with an open mind. Even if the explanation given by the prosecutor had been acceptable on its face, the trial court's role, in reviewing the prosecutor's explanation for the challenge, is to do more than determine whether the prosecutor articulated some basis for the challenge. Under these circumstances, we conclude that the *Batson* three-step process was not followed in this case.

■ Defendant's other constitutional claim relates to the trial court's closure of the courtroom to spectators during the testimony of the complainant. Defendant's attorney objected to the closing on the ground that "open court makes people more honest, and so forth." The prosecutor argued that T.W. had made it known that morning that she was very reluctant to testify and that closing the courtroom would be "of great assistance." The trial court ruled that closing the courtroom was "appropriate in these circumstances, given the fact that she's 15 years old and that she did appear to the Court [in an off-the-record hearing] to be extremely apprehensive about her appearance here today."

When it ordered the courtroom closed, the trial court referred to its authority under Minn.Stat. § 631.045 (1990).[3] This statute authorizes trial courts to "exclude the public" from the courtroom during the testimony of a minor victim in trials of certain sex crimes (including the crime of which defendant was accused) "upon a showing that closure is necessary to protect a witness or ensure fairness in the trial."

Minnesota case law also authorizes trial courts to close courtrooms during the testimony of minor victims regarding sex crimes committed against them. In *State v. Schmit*, 273 Minn. 78, 82, 139 N.W.2d 800, 804 (1966), we stated that "[w]here it appears that minors are unable to testify competently and coherently before an audience because of embarrassment or fright, temporary exclusion of the public is permissible." We went on to hold in that case the exclusion of the public, with the exception of members of the bar and the press, from the entire trial of a criminal case solely because the trial involved obscene matters violated defendant's fundamental rights and required a new trial. 273 Minn. at 88, 139 N.W.2d at 807.

The United States Supreme Court in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982), a case involving a first amendment challenge to the closure of a courtroom, stated that limited closure during the testimony of minor victims of sex crimes may be constitutional. The Court said, "Although the right of access to criminal trials is of constitutional stature, it is not absolute." *Id.* The explanation continued, "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one." *Id.* In the Court's opinion, "safeguarding the physical and psychological well-being of a minor [victim of a sex crime] is a compelling [interest]." *Id.* at 607, 102 S.Ct. at 2620. The Court went on to hold unconstitutional a statute that required closure of courtrooms during the testimony of minor sex-crime victims. *Id.* at 610–11, 102 S.Ct. at 2622. The Court commented, however, that "[a] trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id.* at 608, 102 S.Ct. at 2621. Although the *Globe News-*

---

3. Minn.Stat. § 631.045 (1990) provides:

   **Excluding Spectators from the Courtroom.** At the trial of a complaint or indictment for a violation of sections 609.341 to 609.346, or 617.246, subdivision 2, when a minor under 18 years of age is the person upon, with, or against whom the crime is alleged to have been committed, the judge may exclude the public from the courtroom during the victim's testimony or during all or part of the remain-der of the trial upon a showing that closure is necessary to protect a witness or ensure fairness in the trial. The judge shall give the prosecutor, defendant and members of the public the opportunity to object to the closure before a closure order. The judge shall specify the reasons for closure in an order closing all or part of the trial. Upon closure the judge shall only admit persons who have a direct interest in the case.

*paper* case involved a first amendment challenge to a closure of a courtroom, the standard under the sixth amendment, which is the provision relied upon by defendant in this case, appears to be the same. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 2214, 81 L.Ed.2d 31 (1984).

Although it appears that the trial court interviewed the minor complainant before ordering closure during her testimony, that interview was not recorded. The record does not disclose evidence or findings of a showing that closure was necessary to protect the witness or ensure fairness in the trial. On the record before us we ·cannot say that there has been compliance with the requirements set out in *Waller v. Georgia*, 467 U.S. at 45, 47, 104 S.Ct. at 2215.

■ The final claim of error we address is defendant's claim that the prosecutor committed misconduct in making the following inquiry of defendant on cross-examination:

Q. All right. But in any event, Officer Belmore then placed you under arrest, put your hands up against the squad car, and then searched you, right?

A. Searched me down.

Q. You told him that he was hassling you because you were black?

The trial court had ruled before trial that defendant's pre-*Miranda* statements to the arresting officer were inadmissible on both *Miranda* grounds and relevancy grounds. When the prosecutor asked the question on cross-examination, defense counsel immediately objected and moved for a mistrial. The trial court sustained the objection, instructed the jury to disregard the question, warned the prosecutor that further references to defendant's pre-*Miranda* statements would not be tolerated, and denied the motion for a mistrial.

The state tries to justify the prosecutor's conduct by arguing that the trial court's ruling that the statement was inadmissible was erroneous and that, moreover, the trial court's ruling did not preclude the state from using the statement for impeachment purposes under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and other cases.

We do not address the question of the correctness of the trial court's initial suppression ruling under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and subsequent cases. That a prosecutor disagrees with a trial court's refusal to suppress evidence on constitutional grounds obviously affords no basis for violating the ruling. *Compare State v. Flowers*, 261 N.W.2d 88 (Minn.1978), where we reversed a conviction and granted a new trial because of prejudice resulting from the prosecutor's intentional violation of a pretrial order, with *State v. Schallock*, 281 N.W.2d 186 (Minn.1979), where the violation of the court order was not intentional, not objected to, and not prejudicial. Furthermore, the trial court's ruling excluding the evidence was not just based on *Miranda* but was also based on relevancy grounds. If the prosecutor believed that despite its earlier ruling, the trial court might allow him to use defendant's statement to impeach defendant on cross-examination, the prosecutor first should have sought permission from the trial court to do so. Any time a prosecutor desires to make an inquiry of doubtful propriety, the prosecutor should seek permission from the trial court in chambers before asking the question. *State v. Thomas*, 305 Minn. 513, 232 N.W.2d 766 (1975). The prosecutor did not ask permission in this case. Moreover, the state has failed to articulate what it was that the statement impeached.

■ We address, finally, the issue of remedy.

We have little difficulty in concluding that the prosecutor's improper cross-examination of defendant by itself would not justify the award of a new trial. As we said, the trial court sustained the objection and instructed the jury to disregard the question, thereby, in our view, curing any error.

Ordinarily, of course, harmless error impact analysis applies to trial errors, such as improper admission of evidence, but the United States Supreme Court has made it clear that certain structural defects in the

trial mechanism are immune from harmless error impact analysis because the right involved is so basic to the concept of a fair trial that a violation of the right cannot be considered harmless. *Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). On that basis, the Supreme Court has held that harmless error impact analysis is inappropriate in the case of a conviction if there was racial discrimination in the selection of the grand jury that returned the indictment on which the defendant was tried, *id.* at 1265, and *Vasquez v. Hillery,* 474 U.S. 254, 262–65, 106 S.Ct. 617, 622–24, 88 L.Ed.2d 598 (1986), and is equally inappropriate in the case of a defendant convicted by a petit jury if there was racial discrimination in the selection of that jury, *Batson,* 476 U.S. at 100, 106 S.Ct. at 1725. Similarly, denial of the sixth amendment right to a public trial is not subject to harmless error impact analysis. *Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), and *Waller v. Georgia,* 467 U.S. 39, 49, 104 S.Ct. 2210, 2217, 81 L.Ed.2d 31 (1984). *Waller,* however, made it clear that the remedy should be appropriate to the violation. If a remand for a hearing on whether there was a specific basis for closure might remedy the violation of closing the trial without an adequate showing of the need for closure, then the initial remedy is a remand, not a retrial. *Id.*

In the case of the claimed violation of *Waller,* it might be appropriate for us to remand to the trial court, thus providing an opportunity to make a better record and to make findings specific enough that a reviewing court could determine the propriety of the order for closure during the testimony of the minor witness. By analogy, it could be argued that the appropriate remedy in this case with respect to the issue of whether the prosecutor improperly used the peremptory challenge to exclude the only black juror is to remand and give the trial court a chance to determine whether, in fact, the prosecutor's reason was a pretext to cloak a discriminatory intent or purpose. The argument is premature because we are not satisfied that the prosecutor's explanation, taken as a whole,

meets the *Batson* requirement that the prosecutor articulate a facially valid basis for exclusion. Only if the explanation is facially race-neutral is there any reason to proceed to the third step in the *Batson* process, namely, to test its validity.

Considering all the circumstances, we conclude that defendant is entitled to a new trial.

Reversed and remanded for a new trial.