This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Donald Burns, appeals from his convictions in the Akron Municipal Court for driving under suspension and obstructing official business. This Court affirms.
 {¶ 2} On August 26, 2002, Mr. Burns was charged with failing to use turn signals; traveling left of center; failing to observe a stop sign; failing to use seat belts; driving under suspension in violation of Akron City Code Section 71.07; resisting arrest in violation of Akron City Code Section 136.13; and obstructing official business in violation of Akron City Code Section 136.11. Mr. Burns proceeded to trial before a jury on the charges of driving under suspension, resisting arrest, and obstructing official business. The other charges were resolved separately.
 {¶ 3} Following trial, the jury returned verdicts of guilty as to driving under suspension and obstructing official business. Mr. Burns was acquitted of the charge of resisting arrest. He was sentenced to 180 days on the driving under suspension count and 90 days on the obstructing official business count, to be served concurrently. On December 24, 2002, the trial judge suspended the balance of appellant's sentence. Mr. Burns has timely appealed and has assigned two errors for review.
 First Assignment of Error
"The city committed purposeful racial discrimination when it exercised its peremptory challenges and struck two African-American females, thus violating appellant Burns' rights under the due process clause of theFourteenth Amendment of the United States Constitution."
 {¶ 4} Through this assignment of error, Mr. Burns claims the prosecutor exercised his peremptory challenges in a racially discriminatory manner when he excluded two African-American women from the jury venire, Camilla M. and Cynthia I. The trial court permitted the exclusion, over defense counsel's objection.
 {¶ 5} The relevant facts regarding the voir dire of the jury panel are as follows. The trial court first inquired whether any jurors had any relationships with law enforcement officers or attorneys, or any previous experience with the court system. Camilla M. volunteered that she socialized frequently with two police officers, as well as with the wife of a police detective.
 {¶ 6} The prosecutor then asked the entire panel whether anyone had been stopped by a police officer for a traffic violation within the last two years. Cheryl I. volunteered that she had been ticketed recently and for the first time in her life. The police officer claimed she went through a red light, but she believed it was yellow. Four unidentified jurors also reported recent traffic stops. When asked whether there was anything about such experiences that would affect their ability to be impartial, no one, including Cheryl I., indicated that there was.
 {¶ 7} Defense counsel then had an opportunity to inquire of the panel. He first followed-up with Cheryl I. and asked why she did not contest the ticket she received. She responded that she chose not to invest the time. Defense counsel then inquired whether any of the jurors on the panel felt that they had ever been treated unfairly by the police. One unidentified juror responded that he or she had been unfairly treated in regard to civil rights issues "way back" in the segregation era and in the 1960's. The juror stated that the experience would not affect her ability to be fair and impartial on this jury. Another unidentified juror also responded that her two sons have been stopped constantly.[1]
 {¶ 8} Cheryl I. volunteered that she felt it was unfair for the police officer to have issued her the ticket because the light was yellow. She explained that she first intended to fight the ticket, but was so busy that it made sense to simply pay the ticket, despite believing it to be unfair. She added that she "probably should have" fought it. When asked whether there was anything about her experience that would affect her ability to be fair and impartial on this jury, Cheryl I. indicated that there was not.
 {¶ 9} Defense counsel then initiated an inquiry of Camilla M. because she put her hand to her head and looked away when he asked the panel about police treatment. The attorney asked whether there was any police treatment in her past that continued to affect her. Camilla M. stated: "No, some of my family, older members." She continued: "And I have a problem with driving — I don't know if you've heard, driving while black, heard that term before. * * * I have a brother who owns a Hummer, and they stopped him in one month, 40 times." Camilla M. stated that this occurred in Summit County and that it occurred for "[n]o reason. Just because, you know, they wanted to see the inside of his vehicle or they thought he was doing something that he, you know, he was not doing anything." She stated that no charges arose from those stops.
 {¶ 10} Defense counsel then asked the entire panel whether there was anything about those experiences that would affect the jurors' ability to evaluate the conduct of the police or the defendant, and apparently received no response from the jury.
 {¶ 11} The trial court proceeded to consider challenges to the venire. Four jurors were excused for cause, including one — by defense counsel — who had been a victim of crime on two occasions and "does not like defendants." The prosecutor then exercised two peremptory challenges against Camilla M. and Cheryl I. The prosecutor did not exercise his last peremptory challenge. Defense counsel entered an objection to the prosecutor's removal of these two African-American jurors on the basis of Batson v. Kentucky (1986), 476 U.S. 79,90 L.Ed.2d 69.
 {¶ 12} Without comment, the trial court invited explanation by the prosecutor. The prosecutor stated that he removed Camilla M. because "her sons/family member had had various problems with law enforcement" and because she "mentioned the phrase, DWB, Driving while black." He stated that he removed Cheryl I. because she "expressed a very personal issue with law enforcement." The prosecutor further explained that the City believed that there may be "some resentment towards our position" because Cheryl I. recently received a traffic citation which she believed was unwarranted.
 {¶ 13} Defense counsel countered by stating that Batson prohibits the exclusion of these two jurors for these reasons because they have "life experiences [that cause them to] look at the world a little differently than non-minority people," and they "recognize a potential second America."
 {¶ 14} Noting that the jury still contained two African-Americans and one Hispanic-American, the trial judge permitted the City's peremptory challenges to stand and the case proceeded with the jury as so constituted.
 {¶ 15} The United States Supreme Court has stated that the Equal Protection Clause forbids a prosecutor to peremptorily challenge potential jurors solely on account of their race. Batson, 476 U.S. 79. A defendant has a right to be tried by a jury whose members are selected by nondiscriminatory criteria. Powers v. Ohio (1991), 499 U.S. 400, 404,113 L.Ed 411. Whether a party exercised its peremptory challenges in a discriminatory manner is a finding of fact, which we review under the clearly erroneous standard. Hernandez v. New York (1991), 500 U.S. 352,364-65, 114 L.Ed.2d 395; see, also, Miller-El v. Cockrell (2003),537 U.S. 322, ___, 154 L.Ed.2d 931, 952.
 {¶ 16} Analysis of a Batson claim is a three-step process. First, the defendant must make a prima facie showing that the prosecutor removed a potential juror for a discriminatory reason. Batson,476 U.S. at 96-97. If the defendant makes this showing, the prosecutor has the burden to articulate a nondiscriminatory reason for the removal. Id. at 97-98. Assuming that the prosecutor does so, the trial court must then determine whether the opponent of the peremptory strikes has proven purposeful discrimination. Id. at 98. The ultimate burden of persuasion regarding racial motivation always stays with the opponent of the strike. Purkettv. Elem (1995), 514 U.S. 765, 768; see, also, State v. Gowdy (2000),88 Ohio St.3d 387, 393.
 {¶ 17} It is unclear from the record whether the trial court specifically found a prima facie case of discrimination. We echo the admonition of the Ohio Supreme Court that it is important, for purposes of appellate review, that trial courts use care in reviewing claims of racial discrimination in jury selection, and judges should make clear, on the record, the basis of their decisions regarding each stage of theBatson analysis. See Hicks v. Westinghouse Materials Co. (1997),78 Ohio St.3d 95, 99.
 {¶ 18} In this case, we need not reach this issue because the City has not disputed the point, and inasmuch as the trial court has ruled on the ultimate question of purposeful discrimination, the question of whether Mr. Burns has made a prima facie case of discrimination becomes moot. See, e.g., State v. White (1999), 85 Ohio St.3d 433, 437, citingHernandez v. New York (1991), 500 U.S. 352, 359, 114 L.Ed.2d 395 andState v. Hernandez (1992) 63 Ohio St.3d 577, 583.
 {¶ 19} Our Batson analysis thus moves to the next step: whether the City has offered a race-neutral explanation for its peremptory challenges. This step of the process
"does not demand an explanation that is persuasive, or even plausible. `At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.'" Purkett, 514 U.S. at 768, quoting Hernandez,500 U.S. at 360.
 {¶ 20} The prosecutor is required to give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges. Batson, 476 U.S. at 98, fn. 20. A "legitimate reason" is not necessarily a reason that makes sense, but one that must not deny equal protection. Purkett, 514 U.S. at 769. The prosecutor must therefore provide an explanation "based on something other than the race of the juror." Hernandez, 500 U.S. at 406.
 {¶ 21} In the present case, the prosecutor explained that he was excluding Camilla M. and Cheryl I. because of their problems and issues with law enforcement and the resultant resentment they may hold for police. The prosecutor also referred to the term Camilla M. used: "driving while black."
 {¶ 22} Mr. Burns argues that this is an invalid explanation because the excluded jurors said that they could be fair and impartial in this case. The fact that jurors claimed they could be fair and impartial will not preclude the prosecutor from striking them from the panel with a peremptory challenge. In determining whether the prosecutor has articulated a race-neutral explanation for the peremptory challenge, the explanation "need not rise to the level justifying exercise of a challenge for cause." Batson, 476 U.S. at 97; see, also, White,85 Ohio St.3d at 437. Appellant's remaining arguments are addressed to the question of whether the prosecutor engaged in purposeful discrimination. Accordingly, we proceed to the third step of the Batson analysis.
 {¶ 23} In the third step of this procedure, the trial court must finally determine whether, under all the relevant circumstances, the defendant has met his burden of proving purposeful racial discrimination. Batson, 476 U.S. at 96-97. At this stage, the persuasiveness and credibility of the justification offered by the prosecutor become relevant. Hicks, 78 Ohio St.3d at 99, citing Purkett,514 U.S. at 768; see, also, Miller-El, 537 at ___, 154 L.Ed.2d at 951. The trial court must determine whether the neutral explanation offered by the prosecution is credible or is instead a pretext for unconstitutional discrimination. Hernandez, 500 U.S. at 363. The trial court's finding is entitled to great deference, since it turns largely on evaluations of credibility. Batson, 476 U.S. at 98, n. 21. The decision will not be reversed unless clearly erroneous. State v. Herring (2002),94 Ohio St.3d 246, 257.
 {¶ 24} The facts in this case support the City's explanation. Significantly, the City did not attempt to exclude all African-Americans — or even as many African-Americans as it could — from the jury. See White, 85 Ohio St.3d at 437, citing United States v.Montgomery (C.A. 8, 1987), 819 F.2d 847, 851. Two African-Americans served on the final jury of eight in this case. The City waived its last peremptory challenge.
 {¶ 25} Mr. Burns asserts, on appeal, that the fact that other African-Americans remained on the jury will not preclude his Batson
claim. Mr. Burns also contends that the trial court's inquiry into the final racial make-up of the jury in the course of making its finding is irrelevant to an analysis of whether purposeful racial discrimination has been proven. The argument is without merit.
 {¶ 26} Although the presence of one or more African-Americans on a jury certainly will not preclude a finding of discrimination, the fact that other African-Americans remained on the jury panel may properly be considered as a relevant factor in assessing the genuineness of the prosecutor's race-neutral intent. See White, 85 Ohio St.3d at 438. See, also, United States v. Bartholomew (C.A. 6, 2002), 310 F.3d 912, 920, citing United States v. Yang (C.A. 6, 2002), 281 F.3d 534, 548, certiorari denied (2003), ___ U.S. ___, 123 S.Ct. 1015, 154 L.Ed.2d 912. In the present case, the initial panel of eight jurors contained three African-Americans, whereas the final panel contained two African-Americans and one Hispanic-American. It appears from the record that the exercise of one of the City's peremptory challenges resulted in another African-American coming onto the panel. In addition, the City had one remaining peremptory challenge, which it declined to use.
 {¶ 27} Furthermore, the prosecutor's desire to not have jurors on the panel that may have some resentment against law enforcement, particularly in regard to traffic stops, is a reasonable strategy in a case involving a traffic stop. See Miller-El, 537 U.S. at 951 (whether the proffered rationale has some basis in accepted trial strategy is a proper factor to consider in evaluation of credibility).
 {¶ 28} A review of the record also indicates that while the prosecutor directed a question to the entire panel as to whether any of them experienced recent traffic stops, it was defense counsel who followed-up on that question with both Cheryl I. and Camilla M. The prosecutor did not pursue this area of questioning with the panel or with these particular members of the venire. Cf. Minnesota v. McRae (Minn. 1992), 494 N.W.2d 252, infra.
 {¶ 29} Next, though his argument appears to be directed to the motive of the prosecutor, Mr. Burns, in effect, challenges the race-neutrality of the prosecutor's explanation by asserting that the views expressed by Camilla M. are beliefs held by a great majority of African-Americans. Even if this assertion is true, however, it shows only a disparate impact, and not a discriminatory motive. See Hernandez,500 U.S. at 359-60; see, also, Washington v. McCoy (Wash.App. 2002), No. 47857-5-I.
 {¶ 30} To the extent that Mr. Burns is suggesting that the exercise of peremptory challenges based on a juror's attitude toward racial profiling is a practice having a disparate impact on African-American jurors, we find the argument to be without merit. "[A strike] will not be held unconstitutional solely because it results in a racially disproportionate impact[.]" Hernandez, 500 U.S. at 359-60. The racially disparate impact of a justification that is race-neutral on its face, however, can be considered as evidence that the claimed justification was pretextual. Hernandez, 500 U.S. at 363. It may, therefore, be one of the factors considered by the trial court in evaluating whether there was a discriminatory intent in the exercise of the challenge.
 {¶ 31} However, in this case, there is no evidence in the record upon which to base an assumption that jurors' opinions about racial profiling were likely to vary according to race. Furthermore, even assuming a disparate impact upon African-Americans, when considered within the totality of the circumstances present in this case, we do not conclude that the finding of the trial court is clearly erroneous.
 {¶ 32} The Ohio Supreme Court considered a similar argument inState v. Murphy (2001), 91 Ohio St.3d 516, 530. In that case, the court considered an objection by a defendant to a peremptory challenge based on a juror's view on the "O.J. verdict." The defendant argued that such a practice would have a disparate impact on black jurors. The court rejected the argument for two reasons. First, in order to find disparate impact the court would have to assume that jurors' opinions about the "O.J. verdict" were likely to vary according to race. The record contained no evidence to support such an assumption. Second, disparate impact alone does not violate Batson. Batson proscribes purposeful discrimination; whereas disparate impact is merely evidence from which discriminatory purpose may be inferred.
 {¶ 33} To the further extent that Mr. Burns may be suggesting that a belief in racial profiling should be treated as a "surrogate for race," see Hernandez, 500 U.S. at 371, there again is no evidence in the record to support an assumption that this view is inextricably linked with race or racial stereotypes.
 {¶ 34} Mr. Burns cites Minnesota v. McRae (Minn. 1992),494 N.W.2d 252 in support of his position. In that case, the Supreme Court of Minnesota ordered a new trial because a peremptory challenge was exercised by the prosecutor in violation of Batson. McRae may be distinguished from the case at bar on several grounds.
 {¶ 35} First, the McRae prosecutor peremptorily excluded the only African-American on the entire jury panel. In the present case, the final panel of eight jurors included two African-Americans and one Hispanic-American. Second, the McRae prosecutor singled out the only minority juror for lengthy questioning and asked her questions he had not previously asked other jurors. In the case before this court, the prosecutor addressed his questions, including a question about recent traffic citations, to the entire panel. It was defense counsel who followed up with both of the jurors who were ultimately excluded and inquired of the entire panel as to unfair treatment by police. Third, unlike the prosecutor in the case at bar, the McRae prosecutor continued to press the minority juror for detail, repeatedly invited her to extend her comments, and even suggested answers. Fourth, the reason proffered by the McRae prosecutor for striking the African-American juror was his own interpretation of the juror's statements, suggesting that the juror thought the "system is unfair to minorities," and believing that she would overcompensate by siding in favor of the black defendant. The prosecutor in the present case, on the other hand, cited the jurors' problematic experiences with law enforcement, without the interpretation or elucidation offered by the McRae prosecutor.
 {¶ 36} While excluding a juror for a belief that the system is unfair to minorities was found to be a direct violation of Batson by theMcRae court, the belief that one has experienced unfair treatment by law enforcement may be considered a race-neutral reason for excluding a juror. See State v. Holder, 11th Dist. Nos. 2001-G-2345 and 2001-G-2350,2002-Ohio-7124, at ¶ 42-43. (holding that a negative experience with law enforcement is gender-neutral and not recognized as plain error). While the additional reference to "driving while black" gives cause for careful scrutiny of all the circumstances, the factors present in this case do not warrant a conclusion that the finding by the trial judge in the case at bar was clearly erroneous.
 {¶ 37} Beyond pointing to the allegedly disparate impact of these strikes, Mr. Burns made no showing that the motive of the prosecutor in this case was purposefully discriminatory. The record fails to demonstrate that the prosecutor chose to exclude these two jurors because he wanted to prevent African-Americans from serving on the jury.
 {¶ 38} Finally, Mr. Burns argues that the trial court never determined that Mr. Burns failed to prove racial discrimination. From the trial court's ruling, however, we can infer that the trial court gave credence to the prosecutor's reasons and not to Mr. Burns' allegations of intentional discrimination. See Murphy, 91 Ohio St.3d at 530 (in overruling defendant's Batson claims, trial court implicitly found he failed to show intentional discrimination by the state).
 {¶ 39} The trial judge in this case chose to believe the prosecutor's race-neutral explanation for striking the two jurors in question and rejected Mr. Burns' assertion that the reasons were pretextual. The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. Batson, 476 U.S. at 98, n. 21. Upon this record, we conclude that the trial court's acceptance of the City's race-neutral explanations was not clearly erroneous. Mr. Burns' first assignment of error is overruled.
 Second Assignment of Error
"Appellant Burns' conviction for obstructing official business was against the manifest weight of the evidence as to whether he had the necessary intent to obstruct official business, thereby violating ArticleIV, Section 3 of the Ohio Constitution."
 {¶ 40} Through this assignment of error, Mr. Burns asserts that the weight of the evidence fails to support a conviction for obstruction of official business. Akron City Code Section 136.11 provides, in pertinent part:
"(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties."
Mr. Burns specifically contends that the weight of the evidence fails to demonstrate that he intended to hamper or impede the performance of the arresting officer.
 {¶ 41} When evaluating whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.
 {¶ 42} The relevant testimony before the trial court may be summarized as follows. Akron police officer Patrick Dugan testified on behalf of the City. He stated that he observed Mr. Burns' vehicle traveling at a high rate of speed on East Market Street on the evening of August 26, 2002. He followed the vehicle and observed the driver fail to use turn signals, roll through a stop sign[2], and travel left of center. He believed Mr. Burns was trying to evade him. After the officer turned on his overhead lights and "chirped" the siren, Mr. Burns traveled "about a half a block" before stopping in his own driveway. The officer testified that Mr. Burns pulled forty to fifty feet down the driveway and attempted to exit the vehicle.
 {¶ 43} Officer Dugan, who was working alone that evening, called for back-up. He ordered Mr. Burns back into the vehicle and requested his driver's license, which Mr. Burns could not produce. Officer Dugan then asked Mr. Burns to turn off the engine of his car, to which Mr. Burns reportedly replied, "You f-----' shut it off."
 {¶ 44} At this point Officer Dugan decided to arrest Mr. Burns for obstruction of his investigation of the traffic stop. He based his decision on Mr. Burns' (1) failure to stop when he turned on the overhead lights and sirens; (2) pulling to the rear of his driveway behind his house; (3) failure to comply with orders; and (4) hostile response.
 {¶ 45} Officer Dugan then ordered Mr. Burns out of the vehicle and began to handcuff him. Officer Dugan claimed that with one handcuff on, Mr. Burns started to turn around and "told me to get the f--- off him." He claimed Mr. Burns kicked him, pushed his shoulder into him, and acted as if he was trying to get away. Eventually, after wrestling with him, Officer Dugan got the other handcuff on him. Mr. Burns continued pushing and trying to knock the officer over. Generally, he said, Mr. Burns was hostile and failed to comply. At that time, Officer Dugan used pepper spray on Mr. Burns.
 {¶ 46} Officer Dugan stated that Mr. Burns refused to walk to the police wagon. The officers had to pick him up and put him in the police wagon. Officer Dugan denied punching or striking Mr. Burns. He denied using physical force except for attempting to handcuff Mr. Burns.
 {¶ 47} Sergeant Terry Pasha also testified. He, along with several other officers, responded to Officer Dugan's call for assistance. He described Mr. Burns as extremely agitated, hostile and uncooperative. He described Mr. Burns' interview as being evasive and intentionally deceptive with contradictory statements. Sergeant Pasha stated that he saw no injuries, bruises, cuts, or scrapes. However, Mr. Burns' eyes were bloodshot — either from pepper spray or alcohol. Sergeant Pasha testified that the use of pepper spray was not inconsistent with police protocol in such a situation. He testified that he completed his investigation at the station, because a crowd was forming at the scene.
 {¶ 48} The defense then presented four witnesses, including Mr. Burns, and created some conflicts in the evidence. Demetrion Wilson, an eleven-year-old nephew of the passenger in Mr. Burns' vehicle testified first. He stated that he first saw the vehicle at a stop sign outside a corner store, Bob's Market, near Mr. Burns' home. Demetrion testified that he had a brief conversation with his uncle at the corner. He later saw the overhead lights on the police car come on and continued watching events from a house across the street. Demetrion testified somewhat inconsistently regarding his location when the police cruiser's overhead lights came on. He stated both that he was at a street corner and also that he was at the house across the street from Mr. Burns' home when he saw the overhead lights come on.
 {¶ 49} Demetrion further stated that he saw the police officer handcuff Mr. Burns. He stated that the police officer then tripped him and pepper sprayed him. Demetrion did not know if Mr. Burns was lying on the ground or standing up when he was pepper sprayed.
 {¶ 50} Rico Palmer, the passenger in the vehicle, also testified. He stated that he and Mr. Burns had gone to a friend's home that afternoon. On their return to Mr. Burns' home, they saw Demetrion at Bob's Market and stopped ten seconds or long enough to talk to two people. Mr. Palmer said he and Mr. Burns were aware of the police cruiser behind them at that point, but it did not have its lights on. As soon as they entered the driveway, he asserted, the lights came on. Mr. Palmer testified that there are six to seven houses between the corner store and Mr. Burns' driveway. Mr. Palmer testified that the police officer handcuffed Mr. Burns and threw him against the car. The police officer kicked him in the back of his legs to make him fall to his knees. The officer then took four steps back and pepper sprayed him. He stated that Mr. Burns was on his knees when he was sprayed. Mr. Palmer stated the police officer then dragged him to the wagon.
 {¶ 51} Kelly Buck, Mr. Burns' girlfriend, also testified. She was in the house and watching television when she heard talking and saw flashing lights in the driveway. She said she saw Mr. Burns getting out of the car, and saw a police officer turn him around, throw him up against the car, and place his hands behind his back. She said Mr. Burns stumbled and then regained his balance. The police officer finished putting the handcuffs on him. After he was handcuffed, the officer turned him around, side-kicked him and tripped him. The officer stepped back four or five steps and pepper sprayed him. She stated the police officer tripped him by kicking his feet out from underneath him, from the side. She did not believe the officer put his foot in the back of Mr. Burns' knees and pushed him to the ground. She testified that Mr. Burns was on his knees when he was pepper sprayed, sitting back on the back of his legs.
 {¶ 52} Finally, Mr. Burns testified in his own defense. He admitted two prior convictions for misrepresenting identification and two prior convictions for driving under suspension. He testified that he went with Mr. Palmer to a friend's house that afternoon, where he drank a six-pack of beer. While driving back, they stopped at the stop sign and Mr. Palmer asked Demetrion to bring a pop up the street to him. Mr. Burns stated that he saw the police cruiser follow him from Market Street to Fulton Street and onto Laird Street, where his house was. He stated he saw no overhead lights on the police cruiser until he turned into his driveway.
 {¶ 53} Mr. Burns stated that upon arriving at his home, he turned off the car engine, exited the vehicle, and was handcuffed. He asked what he was being arrested for and got no response. He denies using profanity to the police officer. Mr. Burns stated that the officer slammed him up against the car. He was hit in the back of his legs and fell to his knees. The police officer took four steps back and pepper sprayed him. When the other police officers arrived, one kicked him in the stomach and another put a knee in his neck. He stated that he has been to the hospital several times because of the pepper spray. He was released from jail about 2:00 a.m. the following morning.
 {¶ 54} Based on Officer Dugan's observations of Mr. Burns' erratic driving, he had the discretionary right to stop Mr. Burns' vehicle for traffic violations. The charge of obstructing official business stems from Mr. Burns' actions at that point.
 {¶ 55} Initially, we cannot conclude that Mr. Burns' failure to stop his vehicle within a half a block — even if he did see the overhead lights — may constitute the crime of obstruction of official business. Turning into his own driveway within such a short distance is a reasonable means of getting out of traffic and safely stopping. That act alone does not demonstrate obstruction of official business.
 {¶ 56} However, if Officer Dugan's testimony is credited by the trier of fact, Mr. Burns also pulled his car to the rear of the driveway and immediately exited it, creating an initial safety issue for the sole police officer. The motor was still running when the officer approached the vehicle, according to Officer Dugan. Officer Dugan acted within his authority in ordering Mr. Burns to get back into his vehicle and turn it off at that point. Mr. Burns' verbal and physical refusal to comply with Officer Dugan's order to turn off his car is evidence that he impeded the officer in performing his duty to secure his safety and to conduct the traffic stop. Intent to impede may be found to be inherent in the affirmative words and actions of Mr. Burns, as reported by Officer Dugan. "The intent of an accused * * * must be gathered from the surrounding facts and circumstances[.]" State v. Hoffman (1936),131 Ohio St. 27, paragraph four of the syllabus. See, also, State v.Treesh (2001), 90 Ohio St.3d 460, 484-85.
 {¶ 57} Upon review of the record, we cannot say that the evidence weighs heavily against conviction. As noted above, Mr. Burns' only argument is that he did not do anything purposefully to hamper or impede the official business of Officer Dugan. Notwithstanding the conflicting testimony, the jury had the opportunity to view the witnesses, hear their testimony, and judge their credibility. In light of Officer Dugan's testimony, the trier of fact could have inferred that Mr. Burns acted with the purpose of preventing, obstructing or delaying the officer in his investigation of the traffic stop. After weighing the evidence and all reasonable inferences and considering witness credibility, we do not find that, in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that Mr. Burns' conviction must be reversed and a new trial ordered. The second assignment of error is overruled.
 {¶ 58} Mr. Burns' two assignments of error are overruled. The judgment of the Municipal Court of Akron is affirmed.
Judgment affirmed.
SLABY, P.J. and WHITMORE, J. concur.
[1] Mr. Burns cites to this juror as a comparative example. We also take note of another unidentified juror who claims to have been unfairly treated in regard to civil rights issues. Since both of these jurors were unidentified in the transcript provided to the Court, and the record was not supplemented by the parties, this Court is unable to determine the race of the jurors, whether they ultimately served on the jury, or ultimately to find merit in this argument.
[2] The charging document indicates that the stop sign that Mr. Burns failed to observe was located at Dudley and Laird.