STATE of Minnesota, Respondent,

v.

Billy BAILEY, Appellant.

No. A05–2515.

Supreme Court of Minnesota.

June 7, 2007.

Bridget Kearns Sabo, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Minnesota Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Billy Bailey was convicted of first-degree murder while committing criminal sexual conduct in connection with the May 1984 death of a 69-year-old woman. On direct appeal to this court, Bailey makes four claims of error. We hold that the district court properly rejected Bailey's *Batson* challenge. We also hold that the district court did not err in allowing testimony that certain DNA evidence did not exclude Bailey as the donor, in excluding expert testimony that the state should have conducted validation studies before using a Bunsen burner to remove a cover slip from the DNA sample, or in admitting *Spreigl* evidence that Bailey had confessed to three other burglaries.

### A. Initial Investigation and Conviction

On May 20, 1984, Virginia Golden found her mother, Agnes Fafrowicz, dead in the living room of Fafrowicz's apartment. Investigators determined that Fafrowicz had been robbed and sexually assaulted by an intruder and died from a resulting heart attack on May 16. Fluid samples were taken from Fafrowicz and sperm was detected.

On May 22, police learned that two checks had been drawn on Fafrowicz's account. One check, dated May 17, was made out to "Bill Vollmar–Bailey" for $230 and had been cashed at a liquor store next to Bailey's apartment building. Upon arrest and interrogation, Bailey explained that Fafrowicz wrote the check to him for work he did on her lawn and car. Detectives found Bailey's story implausible for many reasons, chief among them Bailey's claim that Fafrowicz gave him the check on May 18 when she almost certainly died on May 16.

Bailey was charged with first-degree murder while committing criminal sexual conduct and indicted on June 6, 1984. About six months later, the state dismissed the indictment due to its likely inability to prove the case beyond a reasonable doubt.

The state reopened the case in 2000 and obtained from the Medical Examiner's Of-

fice two slides containing the samples taken from Fafrowicz's body during the autopsy. Bureau of Criminal Apprehension (BCA) scientist Catherine Knutson used a Profiler Plus kit to test the samples against a blood sample taken from Bailey during the 1984 investigation. To remove the cover slips from the slides, Knutson heated the slides with a Bunsen burner until the mounting medium began to boil, loosening the slips. A vaginal sample yielded interpretable DNA results at six of the ten tested loci.[1] The resulting profile matched the DNA from Bailey's blood sample.

With this evidence, the state again charged Bailey with first-degree murder while committing criminal sexual conduct. He was indicted, tried, and found guilty in 2002.

■ Bailey appealed his conviction and we reversed and remanded for a new trial. *State v. Bailey (Bailey I)*, 677 N.W.2d 380, 385 (Minn.2004). We held that certain statements Bailey made prior to his *Miranda* warning were admitted in error. We also held that the district court's findings on the reliability of using a Bunsen burner on a DNA sample were insufficient to satisfy the second prong of the *Frye–Mack* standard[2] and justify the admission of the DNA test.

### B. *Frye–Mack* Hearing

Prior to the second trial, pursuant to our instructions, the district court held a *Frye–Mack* hearing. After that hearing, the court concluded that use of a Bunsen burner to remove cover slips and access DNA samples was compatible with DNA Advisory Board standards and thus was generally accepted in the relevant scientific community. Bailey does not challenge that conclusion in this appeal. The court also received as evidence two validation studies on the effect of heating a DNA sample with a Bunsen burner. Both studies concluded that heating a DNA sample on a slide over a Bunsen burner for thirty seconds, as Knutson did, would not degrade the sample. Based on these studies, the court concluded that the state had met its burden under *Frye–Mack's* second prong of showing that the use of the Bunsen burner was not responsible for any degradation of the samples and that the results of Knutson's test were admissible. Bailey does not challenge that conclusion in this appeal.

### C. Sub–150 RFU Peaks

The district court also ruled as a result of the *Frye–Mack* hearing that loci with peaks under 150 RFUs would not be admissible as part of the state's case-in-chief because the BCA's own internal protocols prohibited using such peaks for any pur-

---

**1.** DNA testing produces a graph of peaks. The height of each peak must be at least 150 relative florescent units ("RFUs") to be reportable (reliable enough to apply statistical data to determine the likelihood of an individual being a match for the DNA). The Profiler Plus kit tests ten areas (loci) of DNA, including the amelogenin (the area of a DNA strand that determines the sex of the source). Knutson obtained reportable results at six loci, including the amelogenin.

**2.** The *Frye–Mack* test requires, first, that a novel scientific technique that produces evidence to be admitted at trial be shown to be generally accepted within the relevant scientific community, and second, that the particular evidence derived from the technique and used in an individual case have a foundation that is scientifically reliable. *State v. Roman Nose*, 649 N.W.2d 815, 818 (Minn.2002). "Put another way, the *Frye–Mack* standard asks first whether experts in the field widely share the view that the results of scientific testing are scientifically reliable, and second whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls." 649 N.W.2d at 819.

pose but exclusion (determining that a given individual could not have been the source of the DNA). The court ruled that the sub–150 RFU peaks were likely to be more prejudicial than probative, because "it is a very short step from the assertion that the evidence does not exclude the defendant to the inference of therefore it must implicate the defendant." The court noted, "[t]his is not to say that there is insufficient foundation to preclude the State from inquiring on redirect, should the issue be raised in cross-examination, whether there is anything in the sub–150 RFU peaks that excludes Defendant."

During cross-examination, Bailey's attorney asked this series of questions of Knutson:

Q: * * * And then you have basically up there [referring to a display] nine different locations that you look at in the gene?

A: That's correct. They are nine different areas of DNA that we look at, yes.

Q: And they are called loci?

A: That is what they are referred to as, yes.

Q: But they are areas of DNA that you look at to see if a person might be excluded; is that correct?

A: They are areas of DNA that have been shown to differ between individuals.

Q: And you look at them to see if a person might be excluded?

A: We look at them to compare them to known samples to see whether either inclusion or exclusions can be made.

Q: Okay. And here, I believe you testified, you got results out of five of the nine in terms of doing the calculation that you did; is that correct?

A: Yes, we received, I obtained reportable results for five of the areas.

Q: Okay. Reportable results for five of the areas, is that right?

A: That's correct.

Based on this exchange, the district court ruled that Bailey had opened the door to questioning by the state to establish that nothing in the four sub–150 loci excluded Bailey as the donor. Bailey contends that the district court erred in allowing this testimony.

### D. *Batson* Challenge

During voir dire, the state exercised a peremptory strike against prospective juror 9, a Native American woman. Bailey raised a *Batson* challenge to the strike. In the course of considering the challenge, the district court ruled that Bailey made a prima facie case of racial discrimination, the state offered race-neutral bases for the strike, and Bailey failed to carry his burden of showing that the bases were pretextual and that the strike was actually based on race. Bailey contends that the district court erred because the state's proffered reasons for the strike were pretextual and the strike was racially motivated.

### E. Evidentiary Issues

At trial, Bailey informed the district court of his intention to elicit testimony from defense expert Williams Shields that Knutson should have performed a validation study before using a Bunsen burner to heat the DNA sample. The state objected that this testimony was irrelevant, and the district court agreed, ruling that the timing of the validation study had no bearing on its accuracy. Also during trial, the state introduced *Spreigl* evidence that Bailey pleaded guilty to three other burglaries that occurred in 1985, two of which involved elderly women alone in their homes. Bailey contends that the district court erred in both of these rulings.

Altogether, Bailey raises four issues in this direct appeal. He argues that the district court erred in ruling that the state had a race-neutral reason for striking prospective juror 9, that the district court erred in ruling that Bailey opened the door to testimony that the sub–150 RFU peaks did not exclude Bailey as the donor of the DNA, and that the district court erred in preventing Shields from testifying that Knutson should have performed a validation study before using a Bunsen burner on the DNA samples. Finally, Bailey argues in his pro se supplemental brief that the district court erred in allowing the state to introduce the *Spriegl* evidence.

## I.

■■ We will first consider Bailey's *Batson* challenge. The use of peremptory challenges to exclude prospective jurors is subject to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). A peremptory challenge against a prospective juror on account of her race denies equal protection both to the prospective juror, because it denies her the right to participate in jury service, and to the defendant, because it violates his right to be tried by a jury made up of members selected by nondiscriminatory criteria. *State v. Reiners,* 664 N.W.2d 826, 831 (Minn.2003).

■ The Supreme Court has established a three-step inquiry district courts are to use to determine whether a peremptory challenge is motivated by racial discrimination:

[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step

two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.

*State v. Blanche,* 696 N.W.2d 351, 364–65 (Minn.2005) (quoting *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)); *see* Minn. R.Crim. P. 26.02, subd. 6a(3). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

■■ In the second step of the *Batson* test, "neither a mere denial of improper motive nor an incredible explanation will suffice to rebut the prima facie showing of discriminatory purpose." *Purkett,* 514 U.S. at 770, 115 S.Ct. 1769 (Stevens, J., dissenting). Rather, the prosecutor must "articulate a neutral explanation related to the particular case to be tried." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. The proffered explanation need not be "persuasive, or even plausible." *Purkett,* 514 U.S. at 767–68, 115 S.Ct. 1769.

■ *Batson*'s third step requires two showings of the party making the *Batson* challenge: (1) a demonstration that the proffered race-neutral reason is not the real reason for the strike and (2) a demonstration that the real reason was the race of the prospective juror. *Angus v. State,* 695 N.W.2d 109, 117 (Minn.2005). One way to show purposeful discrimination is to show that a prosecutor's proffered reason for striking a prospective minority juror applies equally to a similar non-minority who is permitted to serve. *Miller–El v. Dretke,* 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The appropriate remedy where a peremptory challenge is ultimately proved to be racially motivated

is an automatic new trial. *State v. Greenleaf,* 591 N.W.2d 488, 500 (Minn.1999).

■■■■■ Findings related to pretext are fact determinations that should be given great deference on appeal. *Reiners,* 664 N.W.2d at 830. "[C]onsiderable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility." *State v. McRae,* 494 N.W.2d 252, 254 (1992). "[I]f * * * the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter." *Hernandez v. New York,* 500 U.S. 352, 375, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (O'Conner, J., concurring).

To determine whether the district court properly rejected Bailey's *Batson* challenge, we must carefully review the record and the state's proffered reasons for the peremptory strike. Prospective juror 9 had a brother-in-law who, before prospective juror 9 knew him, was convicted of domestic abuse. The court asked her about this experience:

Q: So this was something that you really have no personal knowledge of?

A: Right.

Q: Have you had any conversations with anyone about that experience of his?

A: I've never spoken with him about it or my sister about it. My twin sister about it [sic], but I've spoken with my other sister and husband about it just wondering if he was found guilty. But, you know, knowing him now, if he did it or not—.

Later, the following exchange occurred between prospective juror 9 and the prosecutor:

A: I don't know whether I wonder it's a fair verdict [sic]. Sometimes I wonder if he'd do it again, or if he would never do it.

Q: That's not—correct me if I'm wrong, but I thought you had indicated that you had conversations with your husband, not with your sister, but with your other, I believe, sisters is what you said. And your husband. And you wondered whether or not he in fact did that crime?

A: I think I don't know to what extent he did it. But I do believe he did it.

Also during voir dire, prospective juror 9 stated, in response to a question from defense counsel, "I guess I grew up as a minority and there are many people who would judge me right away when they first saw me. And it used to make me, and it still makes me, mad." Defense counsel then informed the prospective juror that other veniremembers had commented on Bailey's appearance in their jury questionnaires, and asked her what she thought about such comments.[3] Prospective juror 9 responded, "Makes me mad." She elaborated, "Like I've said I've went through it. People would see me and/or see me and my twin sister and, you know, either yell things or put us down without even knowing us. Just going by the color of our skin or that [sic] the fact that they knew that we were minorities." Later, the prosecutor asked prospective juror 9, "you said that when asked for your reaction [to other veniremembers' negative comments about Bailey's appearance] you said it makes you mad?" Prospective juror 9 re-

---

**3.** The record before us does not indicate what veniremembers found noteworthy about Bai-

ley's appearance.

sponded, "yes." The prosecutor then exercised a peremptory strike.

Bailey made a *Batson* challenge, arguing that the strike was prima facie discriminatory for two reasons: (1) prospective juror 9 was the first "juror of color" to be interviewed, and (2) the questions asked of her right before the strike were related to her race. The court held that this constituted a prima facie case of discrimination. The state has not challenged this ruling and we will not consider whether or not it was correct. The court then moved to *Batson*'s second step by asking the state for a race-neutral explanation.

The prosecutor offered two race-neutral explanations for the strike. First, he expressed concern that prospective juror 9's answers concerning her brother-in-law were inconsistent, indicating that she may have harbored doubts about the efficacy of the judicial system. Second, he expressed concern that defense counsel's eliciting of the "makes me mad" remark may have had the effect of establishing a "kinship" between the prospective juror and Bailey. The district court ruled that both bases were race-neutral and moved to *Batson*'s third step by asking defense counsel why these reasons were pretextual.

Bailey asserted that the first basis was pretextual because prospective juror 9's answers were not inconsistent but were simply attempts to give an honest answer. Bailey pointed out that despite professing concern about the prospective juror's confidence in the justice system, the prosecutor did not ask about her views of the system. Bailey also noted that prospective juror 9 told the court that her experience with her brother-in-law would not affect her ability to act as a juror. Bailey asserted that the second basis was pretextual because prospective juror 1, a non-minority, was asked similar questions about judging people based on appearance and gave

similar answers but was not struck. The court ruled that prospective juror 9 gave inconsistent answers about her brother-in-law, that the prosecutor could have reasonably believed that the questions about judging based on appearance created a kinship, and that these constituted non-pretextual, race neutral reasons for the strike.

The district court's ruling was not clearly erroneous. Prospective juror 9's statements about her brother-in-law's experience with the criminal justice system were arguably inconsistent and could have led the prosecutor to doubt her confidence in that system. Prospective juror 9's statement that the comments of other veniremembers about Bailey's appearance "makes [her] mad" could have caused the prosecutor to worry that she would unduly identify with Bailey. Prospective juror 1 was asked similar questions but gave a qualitatively different answer; when asked why it was important to resist the urge to assume things about another individual based on appearance, prospective juror 1 replied, "[o]h, because I think you have to get to know people. You can't—first impressions aren't always right, and I think once you get beneath the surface of a lot of people you find some with a lot of good things and some with a lot of bad." Prospective juror 9, in contrast, said that it "made her mad" that people would comment on Bailey's appearance. Prospective juror 1 offered an objective assessment of the dangers of judging people by appearance; Prospective juror 9 displayed an emotional reaction to others' judgment of the defendant in this case.

A different prosecutor might have included prospective juror 9 on the jury without hesitation. But *Batson* does not require a prosecutor to show that a prospective juror is completely unfit for service; it only forbids a prosecutor from

striking a juror based on her race. The burden was on Bailey, under *Batson,* to establish that the prosecutor's explanations were pretextual and the strike was actually based on race. Bailey did not demonstrate that the proffered justifications were a sham, and offered no reason to think the strike was racially motivated. We note that there are no racial overtones in this case; the defendant and the victim are both Caucasian. The record does not reflect that the prosecutor stood to gain anything by striking a Native American juror.

Bailey also argues that the "kinship" basis is troubling "because it so clearly related to prospective [juror 9's] status as, and feelings about, being a minority." In *Hernandez,* the Supreme Court considered a prosecutor's peremptory striking of two prospective Latino jurors because they would have difficulty accepting a translator's rendition of Spanish-language testimony. 500 U.S. at 356, 361, 111 S.Ct. 1859. Hernandez objected to the strikes on the grounds that the prospective jurors' Spanish-language ability bore a close relationship to ethnicity. *Id.* at 360, 111 S.Ct. 1859. Justice O'Connor, concurring with a four-Justice plurality and joined by Justice Scalia, wrote that "[n]o matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race." *Id.* at 375, 111 S.Ct. 1859 (O'Connor, J., concurring). Thus, while prospective juror 9's "makes me mad" answer related to her experience as a racial minority, this does not render the strike race-based.

Bailey also argues that our decision in *McRae* compels us to sustain his *Batson* challenge. In *McRae,* we reversed the decision of the court of appeals that a prosecutor had stated a race-neutral basis

for striking a prospective black juror. 494 N.W.2d at 253. The prosecutor struck a prospective black juror based on statements, elicited at length by the prosecutor, that "the system" had some flaws. *Id.* at 257. We noted that "[t]o allow the striking of this juror on the basis of those answers in effect would allow a prosecutor to strike any fair-minded, reasonable black person from the jury panel who expressed any doubt [that] 'the system' is perfect." *Id.* We went on to hold that *Batson* had not been followed because the district court failed to test the validity of the prosecutor's explanations and did not decide whether they were a facade for discrimination. *Id.* at 257–58.

Procedurally, this case differs from *McRae* in that here, the district court explicitly determined that the explanations were not pretextual and articulated its reasons. Substantively, this case is different because not all fair-minded prospective minority jurors would necessarily have an emotional reaction to remarks made by other veniremembers about a defendant. It seems that this situation must arise only rarely, but even in the unusual situation where veniremembers have had occasion to comment on the appearance of a particular defendant and another veniremember has been informed of that fact and asked for her reaction, not all fair-minded jurors, minority or otherwise, would immediately describe themselves as "mad." Resistance to hasty, superficial judgments is always desirable in jurors. The prosecutor's stated concern, however, was not that prospective juror 9 objected to bias against racial minorities, but that defense counsel asked a question that had the apparent effect of forming an emotional identification between prospective juror 9 and Bailey. *See State v. McDonough,* 631 N.W.2d 373, 385–86 (Minn.2001) (holding that the state's basis for striking the sole prospective African–American juror was race-neutral be-

cause the state "asked the prospective African American juror virtually the same questions as other prospective jurors who did not answer the same questions in a way that exhibited a bias favorable to the defense").

The threat of pretext is lower where, as here, the answer that formed the basis of the prosecutor's peremptory strike was elicited by defense counsel. The threat is also lower where the prosecutor did not alter his usual pattern of questioning for a prospective minority juror, as the *McRae* prosecutor did. This situation is therefore unlike that in *McRae*, where the prosecutor led the prospective juror on a long, convoluted line of questioning until the prospective juror admitted there were "flaws in the system," then mischaracterized the prospective juror as believing that "the system is unfair" and "the whole jury process is a fraud," exaggerations we described as "troubling." 494 N.W.2d at 254–57. We hold that the district court properly rejected Bailey's *Batson* challenge.

## II.

 Bailey argues that the district court erred in ruling that the defense opened the door to testimony that the sub–150 RFU peaks did not exclude Bailey. Evidentiary rulings are subject to an abuse of discretion standard. *State v. Robledo–Kinney*, 615 N.W.2d 25, 29–30 (Minn.2000). Opening the door occurs when "one party by introducing certain material * * * creates in the opponent a right to respond with material that would otherwise have been inadmissible." *State v. Valtierra*, 718 N.W.2d 425, 436 (Minn.

2006) (quoting 8 Henry W. McCarr & Jack S. Nordby, Minnesota Practice—Criminal Law and Procedure § 32.54 (3d ed.2001)). The doctrine "is essentially one of fairness and common sense, based on the proposition that one party should not have an unfair advantage * * * and that the factfinder should not be presented with a misleading or distorted representation of reality." *Valtierra*, 718 N.W.2d at 436 (internal quotations omitted). Under the rule articulated in *Valtierra*, the issue is whether Bailey's questioning gave him an "unfair advantage" or allowed him to present a "a misleading or distorted representation of reality" so as to overwhelm the baseline rule that testimony about the sub–150 RFU peaks was prohibited.[4] *See id.* at 437–38.

Defense counsel asked whether peaks could be used to "exclude" a suspect. Knutson—presumably aware of her need to tread delicately in this area—avoided using the word "exclude": "[t]hey are areas of DNA that have been shown to differ between individuals." Counsel persisted: "[a]nd you look at them to see if a person might be excluded?" Knutson affirmed that it was. Immediately, defense counsel twice highlighted the fact that Knutson "got results" or "reportable results" at five of the nine peaks (excluding the amelogenin) in the sample. The obvious implication of the possibility of exclusion juxtaposed with the incomplete results was that the four missing peaks might have excluded Bailey, had Knutson obtained the results. The district court, therefore, correctly allowed the state to correct this misimpression with testimony that the peaks did not, in fact, exclude Bailey. We hold that the district court properly con-

---

4. Bailey strenuously protests that he "had no intention of opening the door to this type of testimony" and that the testimony was damaging to his defense. These protests are immaterial. Whether the door was opened depends on the effect of questioning on the jury, not the intentions of counsel. Nor must the state's evidence be barred because it hurts the defendant's case.

cluded that the door was opened to this testimony.

## III.

■ The district court held, based on two validation studies conducted after Knutson's DNA testing, that the results of her test were admissible. Bailey sought to introduce testimony from his expert William Shields that Knutson should have performed a validation study before using a Bunsen burner to remove the slip cover on the DNA sample. The district court rejected this proposed testimony, holding that the timing of the validation study was irrelevant.

Bailey now argues that the district court erred by treating its own findings of fact as conclusions of law. In other words, Bailey asserts that the district court excluded Shields's opinion because the court had already decided the DNA results were *admissible*, thus erroneously keeping from the jury expert testimony that may have affected the *weight* to be given to that evidence. This is manifestly not what the court did. The court determined that the timing of the validation studies was irrelevant because it could not reasonably affect the weight to be given to the DNA test. Bailey did not explain to the district court—and does not explain to this court—how the fact that the validation studies were completed after, rather than before, the DNA testing affected the reliability of that testing.

■ Bailey also argues that the exclusion was error because the evidence may have led the jury to regard Knutson's testimony more skeptically and wonder if she was really careful with the sample. Bailey did not make this argument to the district court. A reviewing court may generally consider "only those issues that the record shows were presented and considered by the trial court in deciding the

matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (quoting *Thayer v. Am. Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982)). "Nor may a party obtain review by raising the same general issue litigated below but under a different theory." *Thiele*, 425 N.W.2d at 582. We hold that the district court did not err in excluding Shields's proposed testimony.

## IV.

■ In his pro se supplemental brief and his pro se reply brief, Bailey argues that the district court erred by admitting *Spreigl* evidence that he pleaded guilty in 1985 to three burglaries involving home invasions near his residence, two involving female homeowners over age 60. Bailey argues that there is insufficient similarity between these three burglaries and the Fafrowicz burglary, and that the state did not need this evidence to prove its case against him.

■ The doctrine of law of the case "ordinarily applies where an appellate court has ruled on a legal issue and has remanded the case to the lower court for further proceedings." *Mattson v. Underwriters at Lloyds of London*, 414 N.W.2d 717, 719–20 (Minn.1987). "Issues determined in a first appeal will not be relitigated in the trial court nor re-examined in a second appeal." *Id.* at 720. The *Bailey I* court held that the district court did not abuse its discretion by admitting the *Spreigl* evidence, 677 N.W.2d at 402, and then remanded "for further proceedings consistent with this opinion," *id.* at 404, thus indicating that the holding was to control on remand.

■ Even if the evidence were admitted in error, this court must determine "whether there is a reasonable possibility that the wrongfully admitted evidence sig-

nificantly affected the verdict." *State v. Ness,* 707 N.W.2d 676, 691 (Minn.2006). The evidence of Bailey's guilty pleas likely had no impact on the verdict in this case. As Bailey points out, the district court found that the probability of the DNA profile randomly matching Bailey's was one in 23,000,000, and the state offered expert testimony that the chances of the DNA at the scene belonging to someone else was one in 15,000,000. Bailey pointed out at trial: "That's compellingly strong evidence of identity." The *Spreigl* evidence could not reasonably have affected the jury's verdict.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. I do so because the court's *Batson* analysis will again, as it has in the past,[1] have a negative impact on the ability of people of color to vindicate their Fourteenth Amendment right to participate in jury service. *See State v. Reiners,* 664 N.W.2d 826, 831 (Minn.2003). In this case, the court allows a state to strike a prospective juror who, having personally been the victim of discrimination based on her appearance, expressed anger at the idea that her fellow prospective jurors would form negative opinions about the defendant based solely on his appearance—a fact extraneous and irrelevant to the issues to be decided in the case.

During questioning by defense counsel, prospective juror 9 (Juror 9) indicated that because she was a minority people made judgments about her entirely based on her appearance and that those experiences made her mad and still make her mad. When defense counsel informed Juror 9 that other veniremembers had commented on Bailey's appearance in their juror ques-

tionnaires and asked Juror 9 what she thought about such comments, Juror 9 responded that such comments also made her mad. In so responding, Juror 9 elaborated, "Like I've said I've went through it. People would see me and/or see me and my twin sister and, you know, either yell things or put us down without even knowing us. Just going by the color of our skin or that [sic] the fact that they knew that we were minorities." When questioned by the state, Juror 9 affirmed her earlier statement that such comments made her mad. Because of Juror 9's reaction to the other veniremembers' discriminatory view of Bailey based solely on Bailey's appearance, the state exercised a peremptory strike against Juror 9 asserting that she demonstrated a kinship with Bailey.

In my view, the reason the state gave for striking Juror 9 was neither legitimate nor race-neutral. In essence, the state struck Juror 9 because, having been discriminated against based solely on the color of her skin, that is, her appearance, she opposes discrimination against others, including discrimination against Bailey because of his appearance, which is a superficial and irrelevant criterion. But, "[a]n avowed justification that has a significant disproportionate impact will rarely qualify as a legitimate, race-neutral reason sufficient to rebut the prima facie case because disparate impact is itself evidence of discriminatory purpose." *Hernandez v. New York,* 500 U.S. 352, 376–77, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (Stevens, J., dissenting) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). People who have been discriminated against have a

---

**1.** *See, e.g., State v. Reiners,* 664 N.W.2d 826, 835–41 (Minn.2003) (Page, J., dissenting); *State v. Taylor,* 650 N.W.2d 190, 208–12 (Minn.2002) (Page, J., concurring in part, dissenting in part); *State v. Gaitan,* 536 N.W.2d 11, 18–20 (Minn.1995) (Page, J., dissenting).

heightened sense of and lower tolerance for discriminatory conduct. Thus, allowing the state to strike prospective jurors who have been victims of discrimination based solely on their appearances, and who oppose discrimination against others on that basis, will have a "significant disproportionate impact" on people of color.

I would also note that, just because Juror 9 is angered by and opposes unfair discrimination, it does not automatically follow that she developed a "kinship" with Bailey.

If we allow the state to strike prospective jurors simply because those jurors have been discriminated against based on their appearances and because they oppose such conduct on the part of others, we allow the state to further diminish the Fourteenth Amendment right people of color have to participate in jury service. Because I conclude that the state violated Juror 9's Fourteenth Amendment right to participate in jury service, and because I conclude that the violation was structural error, I would reverse Bailey's conviction and remand for a new trial.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.