STATE of Minnesota, Respondent,

v.

Wade Phillip CAMPBELL, Appellant.

No. A08–1061.

Court of Appeals of Minnesota.

Sept. 29, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

Marie L. Wolfe, Acting Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, MN, for appellant.

Wade Campbell, St. Paul, MN, pro se appellant.

Considered and decided by WORKE, Presiding Judge; ROSS, Judge; and SCHELLHAS, Judge.

## OPINION

ROSS, Judge.

This case arises from a father's hostile comments and threatening behavior toward coaches after his son struck out at bat during a youth baseball game. Wade Campbell appeals his terroristic-threats conviction. Campbell, who is white, argues that the district court committed reversible error by denying his peremptory challenge to remove a veniremember who, like the coaches whom Campbell threatened, is Latino. He also contends that the district court erred by limiting his questions during voir dire and by refusing to instruct the jury on transitory anger. Campbell submitted a pro se brief that argues that he had constitutionally ineffective trial counsel. Because the record does not support the district court's finding that Campbell's racially neutral explanation for peremptorily striking a Latina veniremember was pretextual and based on the veniremember's race, we reverse and remand for a new trial without reaching Campbell's claims of trial error and attorney deficiency.

### FACTS

In June 2007, Wade Campbell attended his 12–year–old son's baseball game. Campbell helped the team warm up and remained in the dugout during the game. Then he became the center of attention. After his son struck out looking, Campbell loudly berated the boy, yelling that he should have been "f-king swinging the bat when he had two strikes." Y.A., the assistant coach and also the head coach's wife, asked Campbell to leave the dugout. Campbell did so, but not before making several racially disparaging comments. Referring to the coaches' son, who was also a player on the team, Campbell said, "Your fat-ass kid out there can't even bend down and get the ball" and "[Y]ou need to

take him back where he came from." He also blurted, "[S]end this guy back to Mexico," and he told the coach's relatives, "[G]et a job." Campbell soon returned to the dugout to intimidate the coaches, N.A. and Y.A. Campbell told them that they had "messed with the wrong guy," and he stated, "I know where you live." Other parents intervened, and Campbell was escorted from the park.

Campbell's conduct the next two days proved his point that he really did know where N.A. and Y.A. lived. The couple first saw Campbell sitting in their next-door neighbor's yard. The neighbor was an acquaintance of Campbell's. N.A. and Y.A. saw Campbell remain in the neighbor's yard for about two hours. The following day, Campbell called N.A. and Y.A.'s home several times. When Y.A. answered, Campbell hung up the phone. After the second call, Y.A. noticed that Campbell was sitting in his truck behind their house. Campbell called later but ended the call after it transferred to an answering machine. Campbell called a fourth time, and N.A. finally answered the phone. Campbell told N.A., "[I'm] going to shoot you like a f-king dog," that N.A. and Y.A. had "f-ked with the wrong eastsider," and that Campbell would "be there in five minutes." Y.A. called the police as N.A. went outside to wait for Campbell. Campbell never arrived.

Police investigated, and they arrested Campbell. The state charged him with making terroristic threats under Minnesota Statutes section 609.713, subdivision 1 (2006). The state gave notice of intent to seek an upward sentencing departure based on Campbell's alleged racial motivation.

The case proceeded to trial. During jury selection, the district court and both attorneys asked the prospective jurors questions. Campbell asked about one veniremember's understanding of the pre-sumption of innocence, but the district court prevented the veniremember from answering. The district court believed that the question was improper because the court construed the question as inviting a legal interpretation. Later, Campbell moved to strike veniremember C.M. for cause because C.M. had indicated that she had health problems, difficulty with English, and concerns about her ability to focus for extended periods. The district court denied Campbell's motion.

The parties made their peremptory strikes. Campbell used four of his five strikes to remove noncaucasian veniremembers from the panel. The panel had only five noncaucasian members. The district court therefore remarked sua sponte that the state might want to bring a *Batson* challenge. It did.

The next morning, the state objected to Campbell's peremptory challenges based on *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and rule 26.02, subdivision 6a(3) of the Minnesota Rules of Criminal Procedure. The state contended that Campbell's peremptory challenges were racially motivated because Campbell had used four of his five strikes against nonwhites on the panel. The state also mentioned that the defendant was Caucasian and the victims were Latino. The district court determined that the state had presented "a prima facie case of racial discrimination."

Before explaining his strikes, Campbell withdrew his challenge to veniremember E.T., an African American male. Campbell's attorney stated that he had race-neutral reasons to strike E.T., but he explained that "we don't want an appearance of impropriety" and "we would be happy to withdraw our strike of [E.T.] and choose someone else." Campbell then explained

his racially neutral reasons for striking the other jurors, including M.T., a Latina. He explained that M.T. "didn't seem to [him] to be as involved in the proceedings as some of the other jurors," that she "did not seem to be paying as close attention as some of the other people on the panel," and that "some things about her demeanor suggested to [him] that she favored the state." He specifically explained that he saw her cross her arms when he was questioning the panel and that he observed her lean and look away when he was talking but appear more engaged when the prosecutor spoke.

The district court determined that Campbell had presented race-neutral reasons for his peremptory strikes. The district court then determined that Campbell's strikes of veniremembers C.M. and V.C. *were not* racially discriminatory. But it found that Campbell's strike of M.T. *was* racially discriminatory. The district court described its rationale, which will be the focus of our analysis:

> I find that the strike of [M.T.] was motivated by a discriminatory intent to exclude [her]. She testified, on my questions of her, that she was born in Mexico, that she is clearly of Mexican/Hispanic heritage. The alleged victim in this case is also of Mexican or Hispanic heritage, number one. Number two, there is a consistent pattern in this case of striking non-white jurors, as pointed out by [the prosecutor]. All four proposed jurors were stricken, and that the court noted, before [the prosecutor's] comments, that it appeared to be in sequential order.... The court finds that the reasons given by [Campbell's attorney] are pretextual in that the court paid very close attention to all of the jurors, and noted that there was no responses to any of the questions that I asked by [M.T.]—I didn't have an "X" on her name for raising her hand on anything I was inquiring

of. She appeared to pay close attention throughout the proceedings, was pleasant, articulate, a bright individual. It appears as though ... her only reason for being excluded is her Hispanic or Mexican descent.

> Further, the court finds that [Campbell's attorney] did not ask questions of any of the stricken minorities, other than [C.M.], and that, again, dealt with her alleged [medical issues]. No attempts were made to discuss anything with [V.C.], [M.T.], one question to [E.T.], which was his belief or his attitudes toward the presumption of innocence—which I struck, and directed immediately that [the defense] move on.

> The court notes that this is an offense involving a crime based on racial bias. There's a motion to depart upward based on the racial bias of this crime, should Mr. Campbell be convicted. It is essential that public confidence, as stated in *McCollum*, in the court system involving race-related trials, and that they have confidence in the integrity of the criminal justice system, in order to preserve community peace in trials involving race-related crimes. The court specifically finds that the ... reasons offered by [the defense], the nonracial neutral reasons are pretextual and, therefore, his strike of [M.T.] is not allowed.

M.T. was seated on the jury, which found Campbell guilty of making terroristic threats. The district court then submitted to the jury the sentencing issue of whether Campbell had selected his victims intentionally based on their race such that his sentence should be enhanced. The jury found that Campbell had not selected his victims based on their race.

Campbell appeals his conviction.

## ISSUE

Did the district court clearly err by finding that Campbell purposely discriminated based on race when he peremptorily struck prospective juror M.T.?

## ANALYSIS

### I

Campbell argues that the district court clearly erred by finding that his race-neutral reasons for striking M.T. were pretexts for purposeful racial discrimination. Whether racial discrimination motivated a peremptory challenge is a factual determination, and this court gives the district court's decision great deference. *State v. Dobbins*, 725 N.W.2d 492, 501 (Minn.2006). But we will reverse the decision if it is clearly erroneous. *State v. Gomez*, 721 N.W.2d 871, 884 (Minn.2006).

■ When a district court erroneously denies a peremptory challenge, the aggrieved party is automatically entitled to a new trial. *State v. Reiners*, 664 N.W.2d 826, 835 (Minn.2003). We hold that automatic reversal remains the appropriate remedy when a trial court erroneously denies a defendant's peremptory challenge, even after the United States Supreme Court's recent decision in *Rivera v. Illinois*, —— U.S. ——, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009). The *Rivera* court held that the erroneous denial of a defendant's peremptory challenge is not a "structural error" requiring automatic reversal under federal law. *Id.* at 1453. But the court expressly left states "free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*." *Id.* at 1456. Nothing in *Rivera* alters *Reiners'* holding that a district court's "erroneous denial of a peremptory challenge ... does not lend itself to harmless error analysis." 664 N.W.2d at 835. This holding rested on our supreme court's independent reasoning arising from the difficulty of "gaug[ing

the error's] particular impact on the verdict," *id.*, and not on the federal case holdings that *Rivera* threw somewhat into doubt. We therefore hold that *Reiners'* requirement of automatic reversal survives *Rivera*.

■ Neither the state nor the defendant may make peremptory challenges that are racially motivated. *See Batson*, 476 U.S. at 86–87, 106 S.Ct. at 1717–18 (holding that purported racial discrimination in jury selection violates defendants' and jurors' right to equal protection of the laws); *McCollum*, 505 U.S. at 59, 112 S.Ct. at 2359 (extending *Batson* to criminal defendants' peremptory challenges). In *Batson*, the Supreme Court established a three-step process to analyze whether a peremptory challenge was racially motivated. 476 U.S. at 96–98, 106 S.Ct. at 1723–24; *see also* Minn. R.Crim. P. 26.02, subd. 6a(3) (using the same three-step process from *Batson*). First, the objecting party must establish a prima facie case of purposeful discrimination showing that a member of a racial group has been peremptorily excluded from the jury and that the case's circumstances indicate that race prompted the exclusion. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. Second, if the party objecting to the strike establishes a prima facie case, then the proponent of the strike must provide a race-neutral explanation. *Id.* at 97, 106 S.Ct. at 1723. Third, the district court must determine whether the opponent of the strike has proven purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724. This determination requires the objecting party to show both that the race-neutral reason was pretextual and that the real reason for the strike was the prospective juror's race. *State v. Bailey*, 732 N.W.2d 612, 618 (Minn.2007).

Campbell contests only the district court's decision regarding the state's *Batson* challenge applied to M.T. We there-

fore address only the district court's analysis of that *Batson* challenge.

■ The party making a *Batson* challenge establishes a prima facie case of racial discrimination by showing that "(1) one or more members of a racial group have been peremptorily excluded from the jury, and (2) circumstances of the case raise an inference that the exclusion was based on race." *Angus v. State*, 695 N.W.2d 109, 116 (Minn.2005). Out of 21 prospective jurors, Campbell used four peremptory strikes to exclude two Latinos, one Hmong, and one African American in this case involving two Latino victims allegedly terroristically threatened by a white defendant. Given the races of the stricken veniremembers, the victims, and Campbell, the record supports the district court's conclusion that the state presented a prima facie case of racial discrimination. *See id.* at 117 (noting that inference of discrimination depends on races of defendant and victim). Because the state presented a prima facie case of discrimination, the burden shifted to Campbell to show a race-neutral reason for his peremptory strike. *See* Minn. R.Crim. P. 26.02, subd. 6a(3).

■ The district court found that Campbell's attorney had "presented a race neutral explanation for his strike of [M.T.]." The finding is not in dispute, and it is factually supported. Specifically, Campbell stated that M.T. appeared less engaged, she appeared to favor the state, and the prosecutor had apparent rapport with her during voir dire. *See Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (stating that reason need not be "persuasive, or even plausible" and that absent an inherent discriminatory intent it will be considered race-neutral).

■ The district court continued to step three of the *Batson* analysis, stating that "[i]t's now for [the court] to decide whether or not that explanation is pretextual in order to remove [M.T.] due to [M.T.'s] race." The district court then found that Campbell's stated reasons were pretextual and that his peremptory challenge was actually motivated by racial discrimination. Addressing each of the district court's seven reasons for denying Campbell's peremptory challenge, we conclude that the district court's finding is unsupported or contradicted factually and therefore clearly erroneous.

First, the district court stated that Campbell had a "consistent pattern ... of striking non-white jurors." This was the district court's most compelling reason for its finding of racial discrimination. But the district court had found insufficient support for the state's claim that Campbell's other peremptory strikes were racially motivated. Its statement implying that there was a "pattern" of discrimination is therefore implausible. Campbell claimed to have race-neutral reasons for striking veniremember E.T., but he nonetheless withdrew his peremptory strike of E.T. More significant, the district court determined that Campbell's race-neutral reasons for removing C.M. and V.C. were not pretexts for purposeful discrimination; rather, the district court determined that Campbell removed those jurors based on his legitimate concerns about the one juror's attention-impairing health issues and the other juror's close relationship with law-enforcement officers. *See Reiners*, 664 N.W.2d at 834 (indicating that veniremembers's involvement or relative's involvement in law enforcement is a legitimate basis for a peremptory challenge); *State v. Martin*, 614 N.W.2d 214, 222 (Minn.2000) (affirming district court determination that preoccupation and anxiety about possible job loss and finances were race-neutral reasons and not pretextual). The district court expressly acknowledged that Campbell's strike of C.M. was espe-

cially reasonable because it was "obvious [that C.M. was] reluctan[t] to sit on this jury."

The inference that the strike of M.T. was part of a "pattern" of discrimination cannot be sustained because, according to the district court, Campbell's other peremptory strikes of nonwhites had valid, nonpretextual, race-neutral explanations. The supreme court has explained that "[t]he existence of a prior strike of a minority, based on race-neutral reasons that were not questioned, does not raise an inference that a subsequent strike of a minority was discriminatory." *Angus*, 695 N.W.2d at 117; *see also Reiners*, 664 N.W.2d at 833 (determining that state could not prove a pattern of using peremptory strikes to exclude minority veniremembers who were drawn one at a time and the *Batson* challenge involved the second juror drawn). The district court's primary finding of a "pattern" of striking nonwhite veniremembers therefore cannot support its finding of intentional racial discrimination.

■ Second, the district court emphasized that M.T. did not raise her hand in response "to any of the questions that [it] asked" during voir dire. Campbell did not challenge M.T. based on her responses to the district court, however, but on his observations of M.T.'s demeanor and body language, such as "cross[ing] her arms," being less "engaged with [Campbell]" than the state during voir dire, "leaning away," and "looking away." *See Batson*, 476 U.S. at 89, 106 S.Ct. at 1719 (stating that an attorney generally "is entitled to exercise permitted peremptory challenges *for any reason at all*, as long as that reason is related to his view *concerning the outcome of the case* to be tried") (quotation omitted) (emphasis added). And it is appropriate for a defendant to remove a veniremember on his observation-based concern that the veniremember is predisposed to decide for

the state. Campbell's observations of M.T.'s demeanor—which the district court did not deem to be fabricated—are valid, race-neutral reasons for peremptorily challenging a veniremember. *See State v. Pendleton*, 725 N.W.2d 717, 727 (Minn. 2007) (stating that state's peremptory challenge to veniremember based on possible sympathy to defendant's case was "a permissible use of its challenges"); *State v. Gaitan*, 536 N.W.2d 11, 16 (Minn.1995) (upholding state's peremptory challenge that was based on three race-neutral reasons involving "lack of education, demeanor, and reluctance to sit in judgment"); *State v. McRae*, 494 N.W.2d 252, 257 (Minn.1992) (stating that a juror's demeanor and tone can be considered to determine whether the factors played a role in the peremptory challenge); *State v. Weatherspoon*, 514 N.W.2d 266, 269 (Minn. App.1994) (stating that concern about rapport developing between defense attorney and veniremember is a race-neutral reason and noting that its subjectivity could indicate "unconscious or conscious discrimination"), *review denied* (Minn. June 15, 1994). M.T.'s responsiveness to the district court's questioning during voir dire is irrelevant to Campbell's stated concern.

Third, the district court found that M.T. "[paid] close attention throughout the proceedings." The district court misses Campbell's specific challenge regarding attentiveness. Campbell asserted, based on his own observations, that M.T. "did not seem to be paying *as close attention as some of the other people* on the panel." That M.T. was generally attentive does not directly address Campbell's stated basis that the other jurors appeared to be relatively more attentive.

■ Fourth, the district court mentioned that M.T. was "clearly of Mexican/Hispanic heritage" and so were the victims. This merely restates the basis for

the prior finding that a prima facie case of discrimination exists. The state had relied on this fact in framing the prima facie case to show an inference of discrimination. But more is needed to show that Campbell's race-neutral reason was a pretext for purposeful discrimination. It is true that a factfinder's disbelief of the race-neutral reasons put forward by the striking party might build upon the facts establishing the prima facie case to convince the factfinder that intentional discrimination has occurred. *Cf. St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) (explaining standard in employment discrimination cases). As just noted, however, the district court's basis for questioning the merit of Campbell's race-neutral reasons for striking M.T. was a misconstruction of the race-neutral reasons actually presented. That the stricken juror and the victims share the same ethnicity therefore adds little to the analysis of whether Campbell's race-neutral reason was the real reason for his peremptory strike or whether race motivated his peremptory challenge.

The fifth reason stated for denying Campbell's peremptory strike of M.T. was that the district court observed that M.T. "was pleasant, articulate, [and] a bright individual." At best, this observation that the Latina veniremember is "bright" and "articulate" is irrelevant. These are even weaker grounds to grant the state's *Batson* challenge than the ground that the supreme court expressly rejected in *Reiners.* In *Reiners,* the supreme court reversed the district court's finding of race discrimination, holding that the district court's "determination that the prospective juror could be fair to [the defendant] was irrelevant to the *Batson* analysis." 664 N.W.2d at 833. Whether M.T. is pleasant, articulate, and bright has no bearing on the *Batson* question of whether Campbell eliminated her because of her race.

Sixth, the district court stated that Campbell "did not ask questions of any of the stricken minorities, other than [C.M.]." In some cases, the failure to ask certain questions might be relevant to an inference that the party struck a veniremember based on race. But not here. The record shows that Campbell barely questioned *any* veniremembers during voir dire. His entire voir dire was very brief. He asked E.T. one question, which fell to a sustained objection; another to a veniremember about a relative who had a brush with law enforcement; and the remaining questions to C.M. regarding health and family issues. The state has failed to explain how Campbell treated M.T. any differently than he treated the other veniremembers who, for the most part, also received no questions at all. *Compare Reiners,* 664 N.W.2d at 833 (stating that the state failed to prove that the defendant questioned the veniremember differently from the other veniremembers) *with McRae,* 494 N.W.2d at 257 (recognizing that the state departed from its questioning pattern during the voir dire of an African–American veniremember). The district court's reason does not support a finding of purposeful discrimination.

Seventh, the district court stated that because Campbell's case involved a claim of racial bias, "It is essential ... that [the public] have confidence in the integrity of the criminal justice system, in order to preserve community peace in trials involving race-related crimes." This language paraphrases *McCollum:* "The need for public confidence is especially high in cases involving race-related crimes.... Public confidence in the integrity of the criminal justice system is essential for preserving community peace in trials involving race-related crimes." 505 U.S. at 49, 112 S.Ct. at 2354. But the Supreme Court expressed this general principle only as one of the central policy reasons why intentional, race-based juror exclusion is offensive

and intolerable. It was not establishing that courts should consider potential community reaction when deciding whether to retain a specific juror. There is no potential-community-outrage factor in a *Batson* analysis such that a court may consider whether the jury's racial composition might impact community peace in a racially inflamed criminal trial. Although the community's confidence in the justice system is critical for the reasons given in *McCollum*, upholding that confidence is not a factor in deciding whether to grant or deny a *Batson* challenge. *See Angus,* 695 N.W.2d at 117 (stating that "the general desire to achieve a diverse jury cannot be the basis to sustain a *Batson* objection where the circumstances of the case do not support an inference that the party exercising the strike has a discriminatory motive"). Among other reasons for this, "the community" lacks standing to assert a *Batson* challenge. *See Reiners,* 664 N.W.2d at 831 (explaining that defendants and prospective jurors have standing to assert a *Batson* challenge).

We observe that the district court may have been merely restating *McCollum's* general proposition for background's sake without attempting to offer it as support for retaining M.T. on the jury. But the context of the comment suggests that the court might have considered its desire "to preserve community peace" and to maintain public respect for the justice system as part of its assessment of whether to allow M.T.'s peremptory removal. We therefore must address the reference in that light. And we hold that concerns about negative public reaction to the jury's racial composition provided no basis under *Batson* to prevent Campbell from removing M.T. with his peremptory strike. Just as the desire to have a racially diverse jury is insufficient to support a *Batson* challenge, so are laudable concerns about avoiding community unrest and preserving

the public's confidence in the justice system.

We have carefully considered all the reasons that the district court provided for its finding that Campbell's race-neutral reasons for removing M.T. were pretexts for purposeful discrimination. We appreciate that the district court was negatively impressed by defense counsel's decisions and that the defendant's public bigotry cast a long shadow from the ballfield to the courtroom. But we conclude that the record lacks sufficient support for the finding. We therefore must hold that the district court clearly erred by granting the state's *Batson* challenge. Because the district court erroneously prevented Campbell from using his peremptory strike against M.T., we reverse Campbell's conviction and remand for a new trial.

## II

Campbell asserts three additional arguments. He contends that the district court abused its discretion by limiting his voir dire questioning, that the district court abused its discretion by refusing to give a transitory-anger instruction, and that he received ineffective assistance of trial counsel. Because we reverse the district court's decision regarding the state's *Batson* challenge, we do not address these arguments.

## DECISION

The district court clearly erred by finding that Campbell's race-neutral reasons were pretexts for purposeful discrimination. Because the state's *Batson* challenge lacks sufficient support, we reverse and remand for a new trial.

**Reversed and remanded.**

WORKE, J., dissents and files opinion.

WORKE, Judge (dissenting).

I respectfully disagree with the majority conclusion that the district court commit-

ted reversible error in denying appellant's exercise of a peremptory challenge to remove a Latino veniremember. While the facts supporting the majority determination are sufficient, I disagree with the conclusion that the district court failed to properly apply the facts of the case to the exercise of a peremptory challenge.

The district court indicated that appellant's attorney had "presented a race-neutral explanation for his strike of [M.T.]." But the majority qualifies the court's statement as a "finding." I do not identify this statement in an isolated context but, rather, conclude that the district court was determining that the second step of the *Batson* analysis had been presented and it was now the court's turn to analyze whether the explanation was pretextual "in order to remove [M.T.] due to [M.T.'s] race." And, here, the court conducted a detailed analysis determining that the strike was *not* race neutral, particularly in light of the facts and history of the case. The court, in a well-reasoned analysis, indicated that appellant had a "consistent pattern . . . of striking nonwhite jurors."

Our job as a reviewing court is to determine whether the court properly applied the *Batson* factors in assuring that jury selection is race neutral. In this case, the court properly did its job in assuring that the jury panel was fairly comprised. In my opinion the record supports the district court's decision in denying appellant's attempt to strike M.T. from the jury panel.

Furthermore, even if the district court improperly seated M.T., the denial of appellant's peremptory challenge is not automatically reversible error based on recent United States Supreme Court precedent. In *Rivera v. Illinois*, —— U.S. ——, ——, 129 S.Ct. 1446, 1450, 1453, 173 L.Ed.2d 320 (2009), Rivera challenged his first-degree murder conviction on Fourteenth Amendment grounds, arguing that the district court improperly denied his peremptory challenge and that the Due Process Clause requires an automatic reversal of a conviction whenever a criminal defendant's peremptory challenge is erroneously denied. *Id.*, 129 S.Ct. at 1453. The Supreme Court held:

> If a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern. Rather, it is a matter for the State to address under its own laws.

*Id.* at 1453. The Court further noted, "Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution," thus, is not reversible error *per se*. *Id.* at 1454. Accordingly, even if the district court erroneously denied appellant's peremptory challenge in this case, seating M.T. did not necessarily violate appellant's constitutional rights and an automatic reversal of his conviction is unwarranted.